**J.S., an individual, Petitioner–Appellee,**

v.

**Carol CHAMBERS, District Attorney, Eighteenth Judicial District, Respondent–Appellant.**

No. 09CA1396.

Colorado Court of Appeals, Div. A.

Sept. 17, 2009.

As Modified on Denial of Rehearing Oct. 22, 2009.

Hutchinson Black and Cook, LLC, Baine P. Kerr, Boulder, Colorado, for Petitioner–Appellee.

Carol Chambers, District Attorney, Andrew Cooper, Senior Deputy District Attorney, Centennial, Colorado, for Respondent–Appellant.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Catherine P. Adkisson, Assistant Solicitor General, Denver, Colorado, for Amicus Curiae the State of Colorado.

Molly Chilson, Deputy District Attorney, Salida, Colorado; Ted C. Tow III, Denver, Colorado, for Amicus Curiae Colorado District Attorneys' Council.

Opinion by Judge WEBB.

Although a district attorney has broad discretion in determining what offenses to prosecute, by statute a judge may either order the district attorney to prosecute a case or appoint a special prosecutor to do so, upon finding that the refusal to prosecute was "arbitrary or capricious and without reasonable excuse." § 16–5–209, C.R.S.2008. Here, because we conclude that this high standard has not been met by clear and convincing evidence, the district court's order appointing a special prosecutor must be reversed.

### I. Summary

Petitioner, J.S., asserted that in 2000 she had been the victim of two sexual assaults committed within Arapahoe County. The Arapahoe County District Attorney's Office declined to prosecute in 2001, when J.S. indicated that she did not wish to proceed; again in 2004, although J.S. by then had agreed to cooperate; and in 2007, despite communications from J.S.'s attorney.

In 2008, J.S. commenced this action for appointment of a special prosecutor. Respondent, Carol Chambers, who had become the District Attorney in 2005, opposed the petition. After holding an evidentiary hearing, the district court concluded that the

likelihood of obtaining convictions was "great," ordered that "charges must be filed" against both suspects, and later appointed the Boulder County District Attorney as special prosecutor.

We do not consider the district court's conclusion on prosecutability dispositive, even if it is correct. Rather, because prosecutorial discretion means that a district attorney need not charge in every prosecutable case, we address whether Chambers' asserted reasons for not prosecuting are supported by some competent evidence, are based on proper factors bearing on prosecutorial discretion, and are not overwhelmed by countervailing proper factors.

Based on J.S.'s initial refusal to cooperate, a jury's possible perception of an improper motive by J.S. for changing her position, the passage of time since the alleged offenses, and a 2007 letter to Chambers from the Larimer County District Attorney's Office concluding that "insufficient evidence exists to warrant the filing of criminal charges," we cannot say that clear and convincing evidence showed the refusal to prosecute between 2004 and 2008 was arbitrary or capricious. Therefore, we reverse the district court's orders and remand for dismissal of the petition.

## II. Introduction

### A. Undisputed Background Facts

During the evening of June 1 and the early morning hours of June 2, 2000, J.S., Riley McMurdo, and Clyde Surrell, all acquaintances who attended the same high school, along with a number of other young people, attended a private graduation party. Alcoholic beverages were plentiful. Most of the witnesses whom the police later interviewed had been drinking, and some of them acknowledged that they were drunk.

J.S. told the officer who took her complaint that after leaving the party, she had fallen asleep in her car while McMurdo was driving it and did not remember anything else until she awoke at approximately 3:00 a.m. She was still in her car, now parked in her garage, and was wearing only a shirt that was different from the one she had worn to the

party. Both Surrell and McMurdo described J.S. as intoxicated, which was her recollection. Most other witnesses believed J.S. to have been so intoxicated that she was incapable of consenting to sexual contact.

According to several witnesses, she left the party in a car driven by a friend in which McMurdo and others were passengers. J.S. and McMurdo sat together and some witnesses observed them kissing. Accounts differ as to whether "the kissing was mutual" and whether J.S. "was capable of responding" to the kissing.

J.S. was driven to her car, parked some distance from the party. After she had been helped into her car, McMurdo agreed to drive her home. Instead, he drove to his house. The sexual contact with McMurdo occurred during the drive to his house.

Surrell arrived at McMurdo's house in a car along with others who had left the party, where they encountered McMurdo and J.S. Surrell agreed to drive J.S. to her home in her car. McMurdo joined the others, who were going to get gasoline for Surrell's car and then pick him up at J.S.'s home. The sexual contact with Surrell occurred during the drive to her home.

When Surrell and J.S. reached her home, they encountered McMurdo and the others, who had been waiting there. Two witnesses, in addition to Surrell and McMurdo, observed J.S. either enter her garage or enter her home, unassisted. One witness added that she was "fully clothed." Surrell, McMurdo, and the others left.

After awakening early the next morning, J.S. suspected that she had been sexually assaulted and immediately contacted the Aurora Police Department. J.S. submitted to a medical examination. According to the emergency department report, the examiner observed some minor abrasions that J.S. suspected she had suffered during the assaults, but did not "see any specific evidence of trauma on the pelvic exam." An addendum to the report noted "some mild erythema bilaterally."

The officer then accompanied J.S. to her home to collect physical evidence. The pants that she had worn to the party were found in

her bedroom. She could not explain how they got there.

Aurora Detective Ronald Hahn was put in charge of the case. Among many other party-goers, Hahn interviewed McMurdo. He admitted having had intercourse with J.S. after she had performed oral sex on him, but he asserted it had been consensual. A friend of McMurdo's told Hahn that in recounting the evening of the party a few days later, McMurdo had described only J.S.'s performing oral sex.

Surrell's versions of the events also varied. In a pretext telephone conversation approximately one week after the party, set up and recorded by Hahn, Surrell told J.S. that she "went down on [him]." When later interviewed by Hahn, however, Surrell denied any sexual contact. He provided a DNA sample.

At that time, Deputy District Attorney Karen Pearson told Hahn, "based upon all of the information at this time, her office would not accept the filing of charges." The record neither explains her reasons nor indicates that Hahn or J.S. took issue with the decision.

Months later, DNA testing of vaginal and anal swabs taken from J.S. identified Surrell's genetic material. Shortly thereafter, Hahn recognized that the alleged offenses had not occurred within the City of Aurora and forwarded the file to the Arapahoe County Sheriff. Investigator Joni Gordanier was assigned to the case, although Hahn continued to have contact with Pearson, J.S., and J.S.'s mother.

In a January 2001 interview, Gordanier informed Surrell of the DNA evidence. He then admitted having had sexual intercourse with J.S., but said that she had consented. Gordanier prepared an Arapahoe County offense report and an affidavit of probable cause for arrest warrant against Surrell, based on Hahn's file. She could not explain the absence of similar action relative to McMurdo. Gordanier did not communicate directly with the district attorney's office before preparing these documents, but testified that she expected charges would be filed against Surrell.

According to Hahn's contemporaneous supplemental report and his testimony, Pearson advised him that "the case against Clyde Surrell was fileable [sic], and that she felt that charges could also be pressed against Riley McMurdo." She requested him to perform unspecified follow-up investigation. He asked for and received her permission to contact J.S.

J.S. was then attending college in Arizona. She testified that Hahn had telephoned and said "they had decided they were going to prosecute and it was just up to me as to whether I wanted to move forward." J.S., who had attempted suicide after learning of the DNA results, whose parents were divorcing, and whose father was terminally ill, told Hahn that she could not go forward.

On learning that J.S. would not proceed, Pearson created a "No File Work Sheet" stating, "[J.S.] does not want to go forward with this for personal reasons (parents divorcing, father ill, [she] tried to commit suicide a few weeks ago). The likelihood of success at trial is slim due to facts."

In 2003, while still attending college in Arizona, J.S. learned of an investigation into alleged sexual assaults by football players and recruiting improprieties at the University of Colorado (CU). She came to believe that Surrell was "the ring leader of the recruiting scandal" and expressed regret to her mother about not having proceeded in 2001, which might have prevented harm to other victims. J.S.'s mother contacted Hahn.

In early 2004, a meeting occurred among Hahn, Pearson, J.S., and J.S.'s mother. According to J.S.'s testimony, Pearson said, "we've decided we're not going to go forward with it because of time issues," "with the length of time that it might be difficult," and "it would look like we were stacking CU's plate and trying to jump on the bandwagon." J.S. did not recall Pearson having said anything "about the strength of the evidence in the case." Hahn testified that Pearson had only referred to the circumstances at CU, but he did not otherwise clarify what was meant by the comment, "look like we were stacking CU's plate and ... jump[ing] on the bandwagon."

J.S. had no further contact with the district attorney's office until March 2007, when her retained counsel wrote to Chambers, apparently requesting that the case be referred to another district attorney. Chambers acknowledged that Surrell had made potentially incriminating statements to the media and she presented the file to several other district attorneys. Because of various conflicts, only the Larimer County District Attorney's Office agreed to review the file.

A chief deputy in that office spoke to Hahn and met with J.S. and her attorney. In a July 17, 2007, letter to Chambers, he concluded that "insufficient evidence exists to warrant the filing of criminal charges" because, among other factors, both McMurdo and Surrell gave similar accounts of J.S.'s behavior; nothing in the file suggested collusion between them; due to her intoxication, J.S. could not testify about the alleged assaults; witnesses observed J.S. walk into her home, fully clothed and unassisted, after Surrell had driven her there; and the pants she had worn to the party were found in her bedroom.

### B. Proceedings Below

Chambers' initial response to J.S.'s petition was not to prosecute, citing "insufficiency of the evidence," "the desires of the victim" in 2001, and the conclusion of the Larimer County District Attorney's Office in 2007. In a supplemental response, Chambers made the following additional assertions:

- Some witnesses saw McMurdo and J.S. kissing shortly before the alleged assaults;
- Both McMurdo and Surrell stated that J.S. had initiated oral sex with them;
- J.S. had no memory of the events;
- Most of the witnesses had been drinking;
- The recollections of the witnesses could be challenged by the defense based on the passage of time; and
- J.S.'s motive for going forward in 2004 could be attacked by the defense because Surrell had been named in connection with extensive publicity of alleged sexual

assaults by football players and recruiting improprieties at CU.

The district court ordered a "limited evidentiary hearing" to resolve factual disputes, including witness availability. See § 16–5–209 (allowing district court to "require the prosecuting attorney to appear before the judge and explain the refusal" to prosecute); Schupper v. Smith, 128 P.3d 323, 326 (Colo. App.2005) (2000 amendment "provid[es] for an evidentiary hearing at the trial court's discretion"). At the hearing, J.S. testified and called Hahn as well as Gordanier. Chambers presented no evidence, relied on her responses, and presented additional argument. For purposes of the hearing, she conceded that the witnesses Hahn had interviewed could be located and would testify consistent with their prior statements. The court received all of the law enforcement investigative files into evidence without objection.

### C. District Court's Decision

The court's lengthy order includes an exhaustive summary of the evidence, drawn from witness statements, police reports, and other materials in the investigative files. The order next makes "Findings of Fact Regarding Ms. Chambers' Refusal to Prosecute," in which the court found "all three witnesses [who testified at the hearing] to be very credible," and summarized matters established by uncontroverted testimony or documentary evidence.

The court then analyzed Chambers' refusal to prosecute and drew conclusions by applying the factors discussed in Sandoval v. Farish, 675 P.2d 300, 303 (Colo.1984), as follows.

#### 1. Availability of Witnesses to Corroborate the Offense

The court noted Chambers' concession that all witnesses could be located and would testify consistent with their statements to law enforcement.

#### 2. Credibility of the Victim

The court reiterated its finding that J.S. was "very credible," but did not address

whether a jury's determination of her credibility might differ.

### 3. Sufficiency of the Evidence and the Likelihood of Conviction

The court focused on two statutes as they existed in June 2000: under section 18–3–402(1), sexual assault in the first degree included sexual penetration if "(e) [t]he victim is physically helpless and the actor knows the victim is physically helpless and the victim has not consented"; and, under section 18–3–403(1), sexual assault in the second degree included sexual penetration if "(c) [t]he actor knows that the victim is incapable of appraising the nature of the victim's conduct." [1]

The court noted that McMurdo and Surrell had admitted sexual penetration. It observed that "[t]he evidence is strong that [J.S.] was extremely intoxicated both during [the party] and thereafter," and added that "[t]here is more than sufficient evidence to prove that Mr. McMurdo and Mr. Surrell were aware of [J.S.'s] level of intoxication when they had sexual intercourse with her." It concluded that "the likelihood of obtaining convictions against both suspects under each statute is great." [2]

The court turned to the decisions not to prosecute in 2001, in 2004, and in 2007. While acknowledging that the case could not have been prosecuted in 2001 without J.S.'s cooperation, it attached "great significance" to the statement in Hahn's supplemental report that in 2001 Pearson had told him "the case against Clyde Surrell was fileable, and that ... charges could be pressed against Riley McMurdo." It further noted that according to Hahn, Pearson never told him the chances of success at trial were low.

As to the 2004 decision, the court said that the "refusal to file charges in 2004 was not based on the sufficiency of the evidence or the likelihood of convictions." It added that "neither the passage of time nor the fear of negative public perception justified the refusal to prosecute."

The court then addressed "Ms. Chambers' arguments" in more detail as follows:

#### (i) J.S.'s inability to recall and her other alleged conduct

The court concluded that J.S.'s inability to recall "does not weaken her claims; it strengthens them," because "[t]he more intoxicated [J.S.] was, the more likely the prosecution will be able to prove beyond a reasonable doubt that she was physically helpless and not consenting or that she was cognitively incapable of appraising the nature of her conduct." With respect to what the defense might make of J.S.'s pants having been found in her bedroom, while she had asserted that she awoke in her car without having them on, the court said that "[t]here is absolutely no evidence in the record relating to when [J.S.'s] pants came off, who took them off, where the pants were taken off, how they got to her bedroom, who put them in her bedroom, or when they were taken to her bedroom." As for kissing between J.S. and McMurdo, the court noted the witnesses' differing recollections of exactly what had occurred, pointing out several statements that "[J.S.] appeared to be too intoxicated to consent to any sexual acts." It also observed that McMurdo's credibility could be attacked based on his inconsistent description of the sexual contact to the friend.

#### (ii) The reasons for Pearson's decision in 2001

Citing "the uncontroverted testimony presented at the December 15, 2008 hearing, the actions taken by detective Hahn and Investigator Gordanier in 2001, and the contemporaneous investigative reports prepared," the court rejected Chambers' assertion that Pearson "did not think it wise to file charges" at that time. The court noted that had Pearson been unwilling to file charges, Hahn would not have asked J.S. if she was willing

---

1. Like the district court, we address only the statutes in effect at the time of the offense, which are now combined in section 18–3–402, C.R.S. 2008.

2. Although the court also discussed "potential additional evidence," it explained that "its findings and conclusions with respect to the sufficiency of the evidence and the likelihood of convictions are independent of such evidence."

to proceed, Pearson would not have requested Hahn to investigate further, and Hahn's supplemental report would not have stated otherwise.

### (iii) The reasons for Pearson's decision in 2004

Because neither Hahn nor J.S. recalled Pearson discussing the sufficiency of the evidence in the 2004 meeting, the court concluded that Pearson's only reasons for not prosecuting then were "the passage of time" and not wanting to appear to be "stacking CU's plate."

With respect to the passage of time, the court observed that "[i]n this era of cold case filings numerous years, and sometimes decades, after the commission of the offense, the passage of three or four years did not represent an excessive amount of time and certainly did not provide a reasonable basis to refuse to file charges." The court referred to older cases that Chambers' office had filed, but did not identify any one specifically. It noted that J.S. and most witnesses could refresh their memories from their previous statements.

With respect to the CU issue, the court said that even assuming "the public's perception was a genuine concern for Ms. Chambers' Office in 2004," this "did not explain why there has been a continuing refusal to file charges during the past five years," because "publicity has significantly dissipated." The court added that while "[t]he perception related to the prosecution of Mr. Surrell in 2004 may well have been a factor to be considered before filing charges," without more it did not establish "good cause consistent with public interest" because "there was more than sufficient evidence in 2001 to prosecute."

### (iv) The Larimer County District Attorney Office's Letter

The court concluded that the chief deputy's analysis "lacks merit because there is sufficient evidence to file charges and obtain convictions against both Mr. Surrell and Mr. McMurdo," emphasizing its earlier discussion that they knew of J.S.'s intoxication at the times of the admitted sexual penetrations.

The court diminished the chief deputy's conclusion that Surrell and McMurdo had given "remarkably similar accounts" because both of them had made inconsistent statements and portions of their recollections were contrary to those of some witnesses. It observed that they "appeared to have been friends on the night in question," but did not reference any evidence of collusion between them. It adopted its prior discussion of J.S.'s pants having been found in her bedroom being unexplained.

### 4. The Prosecutor's Reasonable Doubt That the Accused Are Guilty

The court stated that "[n]o reasonable basis has been articulated to convince the Court that Ms. Pearson's conclusion in February of 2001 that charges were fileable against both suspects is no longer a valid one. The case against each suspect has not gotten worse; if anything, it has the potential to get better."

### 5. Extent of Harm Caused by the Offenses and the Seriousness of the Injuries

Based on J.S.'s suicide attempt, the court observed, "[t]o say that the alleged offenses have severely impacted and seriously harmed [J.S.] would be an understatement."

### 6. Possible Improper Motives of the Complainant

The court pointed out that one of Chambers' letters to counsel for J.S. conceded she does "not doubt the motive of J.S. in changing her mind in 2004," and that Chambers did not challenge J.S.'s motives now.

### 7. Reluctance of the Victim to Testify

While noting the legitimacy of J.S.'s reasons for declining to go forward in 2001, the court cast the issue not as the district attorney's refusal to prosecute in 2001, but as refusal to prosecute "in 2004, which continues to be effective today." It concluded that J.S.'s "commitment ... to participate in the prosecution of charges since early 2004, cannot be questioned."

#### 8. Evidence Relating to the Motive or Intent of the Offenders

The court stated that "there is plenty of evidence in the file that Mr. Surrell and Mr. McMurdo took advantage of [J.S.'s] intoxicated state in order to have sexual intercourse with her without her consent."

#### 9. The Competing Demands of Other Cases On the Time and Resources of the Prosecution

The court concluded that this factor "did not play a role in the refusal to file charges against Mr. Surrell and Mr. McMurdo." The court observed that it "routinely sees cases filed by Ms. Chambers' Office that are weaker and supported by less evidence than [J.S.'s] claims," including "sexual offense cases ... that involve allegations similar to those presented here." The court then discussed similarities to a case filed by Chambers' office in 2008.

Finally, the court noted the parties' agreement that factors such as disproportion of punishment, cooperation of the accused in apprehending the offenders, and likelihood of prosecution by another jurisdiction did not apply.

The district court concluded by granting both J.S.'s petition to compel prosecution "in its entirety" and her request for appointment of a special prosecutor. It ordered that "charges must be filed no later than Monday, October 5, 2009." However, in a later order appointing the Boulder County District Attorney's Office as special prosecutor, the court acknowledged that it "cannot and will not enforce its Order compelling the prosecution of charges if the special prosecutor makes an informed, good faith determination that he or she cannot ethically file or prosecute such charges."

### III. Judicial Review of Prosecutorial Decisions

■ District attorneys, as elected members of the executive branch of government, have broad discretion in the performance of their duties. Colo. Const. art. VI, § 13; *People v. District Court*, 632 P.2d 1022, 1024 (Colo.1981). "The scope of this discretion extends to the power to investigate and to determine who shall be prosecuted and what crimes shall be charged." *Id.; see also People v. Renander*, 151 P.3d 657, 659 (Colo.App. 2006) ("[A]s a general matter, the power to initiate, alter, or dismiss charges rests solely within the prosecuting attorney's discretion, and may not be controlled or limited by judicial intervention.").

Section 16–5–209 limits this power. But ultimately, "[t]he fact that [district attorneys] are elected by the voters of their districts assures their accountability." *State v. Banks*, 271 S.W.3d 90, 154–55 (Tenn.2008); *see also Hilderbrand v. Padget*, 678 P.2d 870, 873–74 (Wyo.1984) ("This is not to say that the citizens of our state are without recourse if they feel the prosecuting attorney is not exercising his discretion in their best interests.... One obvious remedy is that district and county attorneys hold elective office; if their constituents are unsatisfied, they are free to express their feelings at the voting polls.").

#### A. Section 16–5–209

As relevant here, section 16–5–209 provides:

The judge of a court having jurisdiction of the alleged offense, upon affidavit filed with the judge alleging the commission of a crime and the unjustified refusal of the prosecuting attorney to prosecute any person for the crime, may require the prosecuting attorney to appear before the judge and explain the refusal. If after that proceeding, based on the competent evidence in the affidavit, the explanation of the prosecuting attorney, and any argument of the parties, the judge finds that the refusal of the prosecuting attorney to prosecute was arbitrary or capricious and without reasonable excuse, the judge may order the prosecuting attorney to file an information and prosecute the case or may appoint a special prosecutor to do so.

■ Although section 16–5–209 does not address the burden of proof, the district attorney's charging decision has been afforded a "presumption" of correctness, which the challenging party must overcome "by clear and convincing evidence." *Sandoval*, 675

P.2d at 303. An order requiring the prosecutor to explain the refusal "does not shift the burden of proof to the prosecutor." *Id.* And "[a]bsent a clear abuse of discretion, a judge may not substitute his judgment or discretion for that of the prosecutor." *Landis v. Farish,* 674 P.2d 957, 959 (Colo.1984); *see also Tooley v. District Court,* 190 Colo. 468, 471, 549 P.2d 772, 774 (1976).

*Sandoval* suggests that the statute might be properly invoked if the prosecutor's refusal to file charges is "motivated by bad faith, malice, or personal vindictiveness." 675 P.2d at 302 n. 3. Otherwise, cases construing section 16–5–209 do not define the terms that control its application.[3] Nor does any useful legislative history exist.

Nevertheless, our analysis is informed by the following well-established principles:

- "Clear and convincing evidence is that evidence which is stronger than a preponderance of the evidence and which is unmistakable and free from serious or substantial doubt." *DiLeo v. Koltnow,* 200 Colo. 119, 125–26, 613 P.2d 318, 323 (1980) (internal quotation omitted); *Metro Moving & Storage Co. v. Gussert,* 914 P.2d 411, 414 (Colo.App.1995) (same).

- "[T]o constitute arbitrary or capricious exercise of discretion it must appear that 'By exercising its discretion in such manner after a consideration of evidence before it as clearly to indicate that its action is based on conclusions from the evidence such that reasonable men fairly and honestly considering the evidence *must reach contrary conclusions.*' " *Geer v. Susman,* 134 Colo. 6, 8–9, 298 P.2d 948, 949 (1956) (quoting *Van De Vegt v.*

*Bd. of Comm'rs,* 98 Colo. 161, 166–67, 55 P.2d 703, 705 (1936)) (emphasis in original); *see also Lawley v. Dep't of Higher Educ.,* 36 P.3d 1239, 1252 (Colo.2001).

- An abuse of discretion occurs where the decision is manifestly arbitrary, unreasonable, or unfair. *See E–470 Pub. Highway Authority v. Revenig,* 140 P.3d 227, 230 (Colo.App.2006). A reviewing court asks "not whether we would have reached a different result," but rather whether the "decision fell within a range of reasonable options." *Id.* at 230–31.

- " '[D]iscretion is abused only where no reasonable person would take the view adopted....' " *People v. Hoover,* 165 P.3d 784, 802 (Colo.App.2006) (quoting *State v. Heywood,* 245 Kan. 615, 783 P.2d 890, 894 (1989)); *see also Freedom Colo. Info., Inc. v. El Paso County Sheriff's Dep't,* 196 P.3d 892, 899–900 (Colo.2008) (agency abuses its discretion if "decision under review is not reasonably supported by competent evidence in the record.").

These principles require us to apply a very high standard, which J.S. acknowledges, in reviewing challenges to prosecutorial discretion under section 16–5–209. *See generally People ex rel. Losavio v. Gentry,* 199 Colo. 153, 159, 606 P.2d 57, 61–62 (1980) ("[T]his Court has long required that [statutory] restrictions [on district attorneys] be construed as narrowly as possible by the courts."). This narrow construction is consistent with the deference given to prosecutors in other contexts.[4]

We reject any invitation to subject prosecutorial discretion under the statute to an

---

**3.** Comparison of section 16–5–209 to other states' statutes empowering judges to compel prosecutions suggests that Colorado's statute is unique. *See* Abby L. Dennis, *Reining in the Minister of Justice: Prosecutorial Oversight and the Superseder Power,* 57 Duke L.J. 131, 150 n. 139 (2007) (collecting state statutes); Stuart Green, *Private Challenges to Prosecutorial Inaction: A Model Declaratory Judgment Statute,* 97 Yale L.J. 488, 488 n. 4, 494 n. 33 (1988) (same). These statutes are narrowly construed in favor of prosecutorial discretion. *See, e.g.,* 57 Duke L.J. at 151.

**4.** *See, e.g., People v. Kurz,* 847 P.2d 194, 196 (Colo.App.1992) (noting in selective prosecution

case that "[a] district attorney has wide discretion in determining who to prosecute for criminal activity and on what charge."); *see also Harding v. People,* 708 P.2d 1354, 1357–58 (Colo. 1985) ("Some courts have found that court-granted immunity is an invasion of the normal function of the executive branch to weigh competing public interests in determining whether a particular criminal suspect should be prosecuted."); *Renander,* 151 P.3d at 660 (holding court intruded on prosecutor's charging discretion by ordering prosecutor to reassemble certain counts, effectively dismissing other counts, out of concern for "avoid[ing] juror confusion").

"objectively reasonable" test, which she neither defines nor supports with any authority. To the contrary, because the supreme court has identified factors that a prosecutor may consider in exercising discretion, *see Sandoval,* 675 P.2d at 303 & n. 4, we discern no ground to test a decision based on such factors for objective reasonableness. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.,* 320 F.3d 1081, 1092 (10th Cir.2003) ("By providing specific examples of common types of share transfer restrictions that are certainly permissible, the statute saves courts—and corporations and shareholders—the trouble of conducting the reasonableness inquiry that would otherwise be necessary"); *cf. People v. Ellison,* 14 P.3d 1034, 1039 (Colo.2000) (statute offers example of methods "that would cause a reasonable person to be aware that his license was under restraint."). We discuss those factors in the following subsection.

### B. Proper Reasons for Exercising Discretion Not to Charge

Chambers does not argue lack of probable cause for charges against McMurdo and Surrell. However, the probable cause standard "is substantially less than sufficient admissible evidence to sustain a conviction." American Bar Association Standards for Criminal Justice Prosecution Function and Defense Function section 3–3.9 Commentary (3d ed.1993).

The commentary to the American Bar Association Standards for Criminal Justice Prosecution Function and Defense Function section 3–3.9 states that "[a] prosecutor ordinarily should prosecute if ... a crime has been committed, the perpetrator can be identified, and there is sufficient admissible evidence available to support a guilty verdict." After quoting seven "illustrative" factors in section 3–3.9(b), which include the victim's reluctance to testify, that "the prosecutor may properly consider in exercising his or her discretion" not to charge, the *Sandoval* court cited seven additional factors from *Pugach v. Klein,* 193 F.Supp. 630, 635 (S.D.N.Y. 1961). They include, as pertinent to Chambers' reasons for declining to prosecute: (1) likelihood of conviction; (2) sufficiency of the evidence; (3) availability of witnesses in corroboration of the offense; and (4) credibility of the victim. 675 P.2d at 303 n. 4. Collectively, these factors provide "guidelines for reviewing a prosecutor's charging decision" under section 16–5–209. *Id.* at 303.

■ Therefore, we conclude that a prosecutor's discretionary decision not to charge may be based on weighing factors that bear on whether the likelihood of a conviction warrants charging, as was Chambers' decision here. To hold otherwise would require that all cases supported by probable cause be filed. But as the commentary to section 3–3.9 explains:

> It is axiomatic that all crimes cannot be prosecuted even if this were desirable.
>
> . . . .
>
> ... The public interest is best served and evenhanded justice dispensed, not by the unseeing or mechanical application of the "letter of the law," but by a flexible and individualized application of its norms through the exercise of a prosecutor's thoughtful discretion.

*See also Gansz v. People,* 888 P.2d 256, 258 (Colo.1995) (quoting § 3–3.9 commentary).

### C. Scope of Appellate Review

■ No Colorado case addresses the scope of appellate review under section 16–5–209. Some cases focus on the district court's decision, while others scrutinize the prosecutor's decision. *Compare Landis,* 674 P.2d at 959 ("The district court found that the appellants failed to prove that the district attorney's decision was arbitrary or capricious and without reasonable excuse. After reviewing the record, we agree."), *and Schupper,* 128 P.3d at 327 ("Because the trial court complied with the statute in this regard"), *with Sandoval,* 675 P.2d at 303 ("The record establishes that the district attorney investigated Sandoval's complaint").

Chambers asserts that de novo review is appropriate, emphasizing that most of the evidence concerning the alleged offenses was documentary. *See Conklin v. Shaw,* 67 Colo. 169, 177, 185 P. 661, 664–65 (1919) ("essential" evidence was documentary). J.S. asserts that the proper scope of review is a

mixed question of law and fact. For the following three reasons, we agree with J.S.

First, section 16–5–209 provides for a "proceeding," which can include "an evidentiary hearing at the trial court's discretion." *Schupper,* 128 P.3d at 326. This distinguishes review under C.R.C.P. 106(a)(4), where the district court takes no additional evidence, thus putting the appellate court in the same position as the district court. *Empiregas, Inc., of Pueblo v. County Court,* 713 P.2d 937, 939 (Colo.App.1985) ("same position as the district court"); *see also Toland v. Strohl,* 147 Colo. 577, 582, 364 P.2d 588, 591 (1961) ("Essentially it is a review proceeding of an inferior tribunal and thus testimony is not in order.").

Second, findings of fact and credibility determinations made by a district court based on such an evidentiary hearing are disturbed only if "clearly erroneous and not supported by the record." *Chapman v. Willey,* 134 P.3d 568, 569 (Colo.App.2006); *see also Schupper,* 128 P.3d at 327 ("It is the province of the trial court to assess the reliability of the evidence and credibility of witnesses in a case.").

Third, section 16–5–209 contains a governing statutory standard: "arbitrary or capricious and without reasonable excuse." A district court's application of such a legal standard is reviewed de novo. *See, e.g., City & County of Denver v. Crandall,* 161 P.3d 627, 633 (Colo.2007) (Colorado Governmental Immunity Act, § 24–10–109(1), C.R.S.2006); *Joseph v. Equity Edge, LLC,* 192 P.3d 573, 577 (Colo.App.2008) (Colorado Securities Act, § 11–51–101, *et seq.,* C.R.S.2007); *Willey,* 134 P.3d at 569 (Premises Liability Act, § 13–21–115, C.R.S.2005).

Therefore, a district court's factual findings should resolve whether the prosecutor's stated reasons for exercising discretion not to charge are supported by some competent evidence and whether those reasons conform to permissible factors under *Sandoval.* But the court should not substitute its judgment for that of the prosecutor by weighing the evidence supporting the prosecutor's reasons, if those reasons have evidentiary support and conform to the *Sandoval* factors. Such weighing shows only that the district court

"would have reached a different result," *Revenig,* 140 P.3d at 230, thereby improperly "substituting [its] judgment or discretion for that of the prosecutor." *Landis,* 674 P.2d at 959.

The court may also make findings that competent evidence establishes other *Sandoval* factors which weigh against the prosecutor's decision. If so, the appellate record would present a mix of proper factors, all supported by some competent evidence, both disfavoring and favoring that decision. On de novo review, the appellate court would make the ultimate determination that the exercise of the prosecutor's considerable discretion was arbitrary or capricious only if the mix of factors was so skewed that it *"must reach* [a] *contrary conclusion[ ],"* Geer, 134 Colo. at 8–9, 298 P.2d at 949 (emphasis in original). *Cf. People v. Rowland,* 207 P.3d 890, 893, 895 (Colo.App.2009) (balance of factors bearing on treatment of civil sanction as punishment for constitutional purposes "falls far short of 'the clearest proof.' ").

## IV. Relevant Sexual Assault Statutes

Section 18–3–402 (1)(e), as it existed in June 2000, provided that "[a]ny actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits a sexual assault in the first degree if: ... (e) [t] he victim is physically helpless and the actor knows the victim is physically helpless and the victim has not consented." "Consent," which remains codified at section 18–3–401(1.5), is defined as "cooperation in act or attitude pursuant to an exercise of free will and with knowledge of the nature of the act."

Section 18–3–403 (1)(c) provided that "[a]ny actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits sexual assault in the second degree if: ... (c) [t]he actor knows that the victim is incapable of appraising the nature of the victim's conduct." Under this section, unlike section 18–3–402(1)(e), the prosecution need not prove the defendant's awareness of the victim's lack of consent, "[b]ecause a person who cannot appraise the nature of his or her conduct cannot validly consent to sexual intrusion or sexual penetration." *Platt v. Peo-*

*ple,* 201 P.3d 545, 549 (Colo.2009) (internal quotation marks omitted, alteration in original).[5] Thus, proof of incapacity "necessarily negates any consent defense." *Id.*

The latter statute applies when "a victim is incapable of understanding how her sexual conduct will be regarded within the framework of the societal environment of which she is a part, or is not capable of understanding the physiological implications of sexual conduct." *People v. Gross,* 670 P.2d 799, 801 (Colo.1983). This may include a victim who is intoxicated. *See, e.g., Fletcher v. People,* 179 P.3d 969, 972 (Colo.2007) (affirming conviction where victim was intoxicated, "vomited several times and had to be helped to bed," despite evidence "the victim called [the defendant] over to her ... kissed [him], and then engaged in consensual sex.").

Chambers does not dispute, the district court determined, and we agree that because an intoxicated victim may be unable to consent, a person who had sexual contact with such a victim could be prosecuted under these statutes, especially if the alleged assailant knew of the intoxication.

## V. Analysis

■ The district court concluded that "there is more than sufficient evidence to prove beyond a reasonable doubt that Mr. Surrell and Mr. McMurdo each knowingly inflicted sexual penetration on [J.S.] while she was extremely intoxicated" and thus "the likelihood of obtaining convictions against both suspects under each statute is great." Based on an equally exhaustive analysis of the evidence, Chambers identifies many areas where, she contends, the defense could show reasonable doubt. We decline to resolve this dispute because any conclusion that conviction is likely would not establish Chambers' refusal to file charges as arbitrary or capricious action, if that refusal was based on reasons supported by the record and proper under *Sandoval.*

Initially, we note the district court's finding that Pearson considered the case "fileable" in 2001 and 2004 does not preclude Chambers from declining to prosecute. Jim Peters was the District Attorney in 2001 and 2004. The constitutional power now resides in Chambers, not Peters, much less Pearson. Colo. Const. art. VI, § 13. Chambers, not Pearson, is the party against whom J.S. seeks relief. Pearson never took a formal position in a judicial proceeding that could estop Chambers. *See, e.g., Am. Guarantee and Liab. Ins. Co. v. King,* 97 P.3d 161, 167 (Colo.App.2003). Nor does J.S. assert that she relied to her detriment on any actions of Pearson.

Hence, we address the following reasons Chambers identified in response to the petition for her conclusion that proving Surrell's and McMurdo's guilt beyond a reasonable doubt "would not be possible":

- "J.S.'s unwillingness to go forward with prosecution in 2001."
- The defense "could use the CU investigation to [its] advantage in fighting the charges" by arguing that J.S. and the prosecutor "were pressing charges now only to gain a piece of the spotlight."
- By the time a case could be brought to trial after J.S. changed her mind about assisting the prosecution, the "witnesses would have been graduating from college, and it is likely their memories of a high school graduation party four years earlier would have dimmed."

Further, Chambers emphasized the Larimer County deputy's similar conclusion that "insufficient evidence existed to warrant the filing of criminal charges."

We begin with Chambers' explanation of her reasons. We then consider whether Chambers' reasons are supported by some competent evidence. We next examine whether those reasons are based on proper factors under *Sandoval.* Finally, we address whether they are so overwhelmed by other *Sandoval* factors favoring prosecution, also supported by some competent evidence, as to show arbitrary or capricious action.

---

5. *Platt* concerns current section 18–3–402(1)(b), which is identically worded to section 18–3–403(1)(c), as it existed in June 2000.

## A. Chambers' Explanation of Her Reasons

We disagree with the district court's attaching "particular importance" to Chambers' decision "not to call any witnesses or to present any evidence at the hearing" or "cross-examine [J.S.] and her witnesses." Section 16–5–209 provides for a prosecutor's appearance at a court-ordered hearing to "explain the refusal," but "the order does not shift the burden of proof to the prosecutor." *Sandoval,* 675 P.2d at 303. The court then decides based on "the competent evidence in the affidavit, the explanation of the prosecuting attorney, and any argument of the parties." § 16–5–209.

Construing the statutory reference to an "explanation" from the prosecutor as an offer of proof that need not be supported by evidence is prudent because of the possibility that the district court could order prosecution. *Cf. People v. Ma,* 104 P.3d 273, 274 (Colo.App.2004) (section 18–6–801.5 "allows the prosecution to proceed by offer of proof and does not require that it demonstrate by a preponderance of the evidence that the prior act occurred."), *rev'd on other grounds,* 121 P.3d 205 (Colo.2005); *see also People v. Groves,* 854 P.2d 1310, 1313 (Colo.App.1992).

First, were a prosecutor required to present evidence rather than offering an "explanation" or "argument," the resulting record would be available to the defense. For example, cross-examining J.S. at the section 16–5–209 hearing could create a record for impeaching her at trial, which might take on added weight because the record was developed by a prosecutor, who should be supporting the victim.

Second, testimony about Pearson's discussion with other attorneys in her office before declining to charge—which the district court pointed out was argued by Chambers but not proven with testimony—could waive work product protection. *See People v. Martinez,* 970 P.2d 469, 476 (Colo.1998) ("By calling a witness, the defense waives any work product privilege associated with the subject matter of the witness' testimony.").

Third, requiring a prosecutor to present evidence at the hearing to demonstrate weaknesses in the case would potentially make the victim less likely to cooperate, if the court ordered prosecution or further investigation revealed evidence that persuaded the prosecutor to charge.

Thus, although Chambers presented no testimony, under the statute and on this record, we must accept her explanation that the ongoing refusal to prosecute was based on, among other reasons, J.S.'s initial unwillingness to go forward, concern that the defense could use the CU investigation to its advantage, and recognition that witnesses' memories had dimmed over time. The district court's various conclusions that Chambers' assertions are "unpersuasive," "inconsistent," and "belied" by investigative documents reflect an analysis of the evidence, but fall short of an express finding that Chambers was not credible. And Chambers' reliance on the letter from the Larimer County deputy is beyond dispute.

J.S. does not assert on appeal, nor did she below, that these reasons should be discounted as reflecting corruption, contrivance, or a personal stake that Chambers has in the case. *See Sandoval,* 675 P.2d at 302 n. 3. We consider the reference in *Schupper,* 128 P.3d at 327, to the district court being "free to weigh the credibility" of the district attorney's explanation as limited to circumstances where the evidence shows a basis for challenging the district attorney's motive; there, alleged misconduct by members of the district attorney's staff. The same would be true of *Moody v. Larsen,* 802 P.2d 1169, 1175 (Colo.App.1990) (allegation of district attorney's "personal enmity" toward the victim).

## B. Record Support for Chambers' Reasons

J.S. does not challenge the facts underlying these reasons: between 2001 and 2004, she changed her mind about cooperating; when she did so, the CU recruiting scandal and Surrell's role in it had received extensive media attention; and almost a decade has passed since the alleged offenses. The Larimer County deputy's letter speaks for itself. Although the district court's analysis diminished these reasons, it made no finding that they lacked some competent evidentiary support.

Nevertheless, J.S. urges us to adopt the district court's "very carefully reasoned" view that these reasons are insufficient because it concluded that the investigative files suggest a high likelihood of conviction. For example, the district court stated:

- "[P]lenty of evidence" showed "that both suspects knew that [J.S.'s] level of intoxication was such that she could not have consented to engage in sexual intercourse," and "ample evidence" exists showing their awareness that "J.S. was physically helpless and cognitively incapable of appraising the nature of her conduct," thus making "the likelihood of obtaining convictions against both suspects . . . great."

- Despite any negative consequence of the publicity surrounding the CU recruiting scandal, this "was not a reasonable excuse to refuse charges" because "there was more than sufficient evidence in 2001 to prosecute."

- The Larimer County deputy's conclusion "lacks merit" because "there is sufficient evidence to file charges and obtain convictions against both Mr. Surrell and Mr. McMurdo" and "both admitted to having sexual intercourse with [J.S.]"

While we might well have reached the same conclusion, this approach mistakenly equates judicial analysis of prosecutability with abuse of a district attorney's broad discretion not to charge for reasons including likelihood of conviction. The decisions of our supreme court applying section 16–5–209 do not give a district court license to find an abuse of discretion by balancing its view of likelihood of conviction against reasons supported by competent evidence, proper under *Sandoval*, and relied on by a prosecutor in declining to charge.

### C. Chambers' Reasons and the *Sandoval* Factors

We next consider whether Chambers' reasons reflect or are based on proper factors under *Sandoval*. We conclude that the following four reasons for not prosecuting from 2004 to the time of Chambers' response to the petition in 2008 are consistent with *Sandoval*.

### 1. J.S.'s Initial Unwillingness to Go Forward

One of the section 3–3.9(b) factors is the "reluctance of the victim to testify." Three decisions of our supreme court acknowledge the significance of a victim's initial unwillingness to cooperate:

- *Sandoval* identifies the "reluctance of the victim to testify" as a proper factor that the district attorney may consider when deciding whether to prosecute. 675 P.2d at 303

- In *Landis*, the court upheld the district attorney's decision not to prosecute, in part, because the victim "declined to cooperate in the prosecution of [the defendant] for theft of [the victim's] funds." 674 P.2d at 959.

- In *Tooley*, as here, the victim was originally unwilling to "aid the prosecution," but later indicated his intent "to cooperate with authorities." 190 Colo. at 470, 549 P.2d at 773. Nevertheless, the supreme court reversed the appointment of a special prosecutor, stating, "In light of the arrest warrant affidavit indicating the original unwillingness of the victim to testify, the initial hesitation of the district attorney in this case to file charges against [the defendant] does not amount to an abuse of his discretion." 190 Colo. at 470, 549 P.2d at 774.

We are not persuaded to depart from these cases by the district court's observation that J.S.'s willingness "to participate in the prosecution of charges since early 2004, cannot be questioned." The defense could still seek to exploit J.S.'s change of position, despite the strength of her reasons for having declined to go forward in 2001. The next reason shows how that risk could have ripened in 2004.

### 2. Publicity Surrounding the CU Recruiting Scandal

A district attorney may consider the "possible improper motives of a complainant" and the "credibility of the victim" when considering whether to prosecute. *Sandoval*, 675 P.2d at 303 & n. 4; *see* CJI–Crim. 3:06 (1983)

(instructing jury to "[c]onsider each witness' ... motive, ... [and] the manner in which each witness might be affected by the verdict").

Although we defer to the district court's finding that J.S. is credible, a prosecutor must still consider how her motives might be challenged by the defense and the potential effect on the jury's credibility determination. *People v. Roybal,* 775 P.2d 67, 72 (Colo.App. 1989) ("The question of a witness' credibility is always deemed to be in issue and is to be determined by the jury.").

Here, regardless of J.S.'s actual motives, the fact that her willingness to cooperate coincided with the notoriety surrounding the recruiting scandal and Surrell's well-publicized involvement in it, could be used by the defense to portray J.S. as a victim, in Chambers' words, "pressing charges now only to gain a piece of the spotlight."

The limited testimony concerning Pearson's statement in 2004 that "it would look like we were stacking CU's plate and trying to jump on the bandwagon" could be interpreted as mere reluctance to embroil the district attorney's office in a politicized controversy. J.S.'s argument on appeal presumes this interpretation, which the district court characterized as "the fear of negative public perception." We reject this characterization and J.S.'s interpretation for three reasons.

First, according to J.S.'s affidavit supporting the petition, Pearson said "it would look like *I* was trying to jump on the bandwagon" (emphasis added). Use of "I" suggests Pearson's concern was over impeachment of J.S. at trial, not over "negative public perception" of the district attorney's office. Second, insofar as the former would be clearly proper, while the latter might not be, we follow *Sandoval's* "presumption that the prosecutor acted in accordance with the law." 675 P.2d at 303.[6] Third, the phrase "we were stacking CU's plate" is nebulous and what Pearson meant by "we" was never explained.

The district court noted that its analysis "does not end" with the refusal to prosecute in 2004, observing that over the last five years, "publicity has significantly dissipated." *Tooley's* focus on the victim's "initial hesitation" could be read as requiring a point-in-time analysis of a particular prosecutorial decision because, like J.S., that victim changed his mind and decided to assist the prosecution. 190 Colo. at 470, 549 P.2d at 774.

However, a more realistic approach would consider the prosecutor's decision on an evolving basis, weighing all evidence up to the date of the petition, such as the district court undertook. For example, between a discrete decision not to prosecute and the filing of the petition, an alleged victim might recant or a suspect might make inculpatory statements. Here, this evolutionary approach makes the next two reasons more significant, and both of them support Chambers' decision not to respond to the petition by filing charges.

### 3. Passage of Time

The dimming memories of witnesses over time is recognized as a reason why the likelihood of obtaining a conviction similarly diminishes over time. *See People v. Valdez,* 178 P.3d 1269, 1276 (Colo.App.2007) (laches doctrine in criminal cases includes prejudice from "the dimming of witnesses' memories."); *see also People v. Sepulveda,* 65 P.3d 1002, 1008 (Colo.2003) (noting high social cost of vacating conviction and remanding for retrial because "witnesses' memories fade, witnesses move away and victims hesitate to testify again."). A district court is obligated to instruct the jury on "strength of memory." CJI–Crim. 3:06 (1983). Therefore, the passage of time bears on the "sufficiency of the evidence" and "availability of witnesses in corroboration of the offense," two of the *Sandoval* factors. 675 P.2d at 303 n. 4.

Chambers' concession at the hearing that the witnesses could be found and would testi-

---

**6.** For this reason, we need not decide whether a decision based on fear of "negative public perception" is in "the public interest," although the district court concluded it was not. Section 3–3.9(b) ("The prosecutor may in some circum-

stances and for good cause consistent with the public interest decline to prosecute, notwithstanding that sufficient evidence may exist to support a conviction.") (quoted in *Sandoval,* 675 P.2d at 303).

fy consistently with their previous statements, and the district court's reference to unspecified "cold case" prosecutions, do not persuade us otherwise. Eight years had passed between the alleged assaults and Chambers' response to the petition. A prosecutor could refresh witnesses' memories with their statements under CRE 612(1) and might even be able to admit the statements under section 16–10–201, C.R.S.2008. But the likelihood of their having any independent recollection of a long-past social event, where alcoholic beverages were in abundance and nothing untoward appeared to have occurred until knowledge of J.S.'s allegations surfaced over the next few days, was a legitimate consideration. *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:93, at 624 (3d ed.2007) (describing refreshed recollections as "a last-ditch means to secure information known to the witness but apparently lost to conscious memory . . . .").

The district court's order cites no authority, nor have we found any, indicating that a district attorney's decision to prosecute one or more cases sets a standard for abuse of discretion in declining to prosecute a similar type of case. *Cf. Kurz*, 847 P.2d at 196–97 ("[T]he fact that some people escape prosecution under a statute is not a denial of equal protection unless selective enforcement of the statute is intentional or purposeful."). And even if such a standard could be justified, its application here is undercut by J.S.'s failure to argue corruption, contrivance, or a personal stake of Chambers.

### 4. Letter from the Larimer County District Attorney's Office

Finally, the Larimer County chief deputy concluded that "insufficient evidence exists to warrant the filing of criminal charges." The letter describes a reasonable process: "a review of the materials provided by [Chambers], conversations with Detective Hahn[ ], and a meeting with J.S. and her attorneys." *See Sandoval*, 675 P.2d at 303 (no abuse of prosecutorial discretion where district attorney "investigated Sandoval's complaint, reviewed the law and the evidence, and came to the conclusion that he would be unable to

obtain a conviction."); *United States v. Carson*, 434 F.Supp. 806, 810 (D.Conn.1977) ("The usual and customary internal administrative steps were pursued and the same criteria were applied by the prosecutors in handling the defendant's case as with every other similar case.") (cited with approval in *Sandoval*).

J.S. does not assert that this conclusion was the product of any special accommodation to Chambers. On the contrary, Chambers' offer of an informal referral to another district attorney was acknowledged by J.S.'s attorney. We are not persuaded to discount the deputy's conclusion by the district court's critique of the underlying analysis, which, as indicated, shows only how one court "would have reached a different result." *Revenig*, 140 P.3d at 230.

For example, the district court challenged the deputy's "assessment that Mr. Surrell and Mr. McMurdo 'gave remarkably similar accounts' of the events and [J.S.'s] actions" on the basis that McMurdo's statement to Hahn was "partially inconsistent" with a statement that he "allegedly made" to a friend. But McMurdo's two statements are consistent on a key factor: J.S. performed oral sex. A prosecutor could decide that the latter would be more significant at trial, especially because Surrell described similar conduct by J.S. during the pretext telephone call shortly after the alleged assaults.

The district court "strongly disagree[d]" with the deputy's conclusion that "nothing in the file . . . show[s] that [McMurdo] and [Surrell] colluded to fabricated their stories." But the court points to no evidence that they did so. Had that been their objective, Surrell would have admitted engaging in oral sex with J.S. when he first spoke to Hahn, as McMurdo did when he was interviewed at about the same time, rather than denying all sexual contact.

The district court also discounted the deputy's reliance on J.S.'s pants having been found in her bedroom as corroborating the statements of McMurdo, Surrell, and two witnesses, which the deputy summarized as "when [J.S.] was left at her house, she was fully dressed and walked into the house under own power." It noted that the deputy

"improperly assumes that [J.S.] took off her own pants, that she did so inside her house, and that she placed her pants in her bedroom." J.S., too, asserts that the deputy's conclusion regarding her pants is "unsupported by the evidence."

We recognize that one witness saw J.S. enter her garage, while the other saw her enter the house, and only one of them offered that she was fully clothed, as did McMurdo. But neither the district court nor J.S. suggests a more plausible inference from the location of the pants, which J.S. cannot explain, than that she entered her home unassisted, went to her bedroom, and left her pants there. Nor do we perceive one. Further, and as the deputy determined, this inference is consistent with the recollections of Surrell, McMurdo, and two witnesses as to the circumstances under which they last saw J.S. that evening.

### D. *Sandoval* Factors Favoring Prosecution

The district court found that with the exception of four irrelevant factors,[7] the record supported all of the *Sandoval* factors, which it determined favored prosecution. Nevertheless, each of Chambers' four reasons discussed in the prior subsection is supported by some competent evidence and reflects or closely relates to one or more of the following *Sandoval* factors: possible improper motives of a complainant; reluctance of the victim to testify; likelihood of conviction; sufficiency of the evidence; availability of witnesses in corroboration of the offense; and credibility of the victim. 675 P.2d at 303 & n. 4.

### VI. Conclusion

Because the record presents a mix of factors, some favoring prosecution and others favoring Chambers' decision not to charge, the governing legal standard whether that decision was arbitrary or capricious is subject to de novo review. We conclude that Chambers' explanation identifies reasons for declining to prosecute Surrell and McMurdo

that are supported by some competent evidence, are proper under *Sandoval*, and are not so overwhelmed by the factors favoring prosecution as to compel the conclusion that Chambers' exercise of her broad discretion was arbitrary or capricious. Hence, we further conclude that J.S. has failed to satisfy the high standard for proof by clear and convincing evidence of an arbitrary or capricious refusal to prosecute.

Accordingly, we reverse the district court's orders appointing a special prosecutor and the case is remanded to the district court with instructions that J.S.'s petition be dismissed.

Chief Judge DAVIDSON and Judge CASEBOLT concur.

---

7. The district court acknowledged, and the parties do not dispute, that the following *Sandoval* factors do not favor one side or another: the disproportion of the authorized punishment in relation to the particular offense; the cooperation of the accused in apprehension or conviction of others; the availability and likelihood of prosecution by another jurisdiction; and the competing demands of other cases on the time and resources of the prosecution. 675 P.2d at 303 & n. 4.